**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CASE NUMBER 4:17-CR-00083-MAC-CAN |
| | § | |
| JERRY LYNN COLEMAN(1) | § | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Pending before the Court is Defendant Jerry Lynn Coleman's Motion to Suppress ("Defendant's Motion to Suppress") [Dkt. 39]. On October 12, 2018, and continuing on October 15, 2018, the undersigned conducted an evidentiary hearing and heard oral argument from both the Government and Defendant on the pending Motion to Suppress. After considering the Motion to Suppress, all relevant filings and evidence, as well as the oral argument of counsel presented at hearing, and the supplemental briefing received the Court recommends that Defendant's Motion to Suppress [Dkt. 39] be **DENIED**.

**BACKGROUND**

**I.    THE INDICTMENT**

On May 10, 2017, Defendant was indicted for a violation of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm) [Dkt. 1]. On July 11, 2018, a four-count Superseding Indictment was entered for: (1) a violation of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm); (2) a violation of 21 U.S.C. § 841(a)(1) (possession with the intent to distribute cocaine and marijuana); (3) a violation of 18 U.S.C. § 924 (c) (possession of a firearm in furtherance of a drug trafficking crime); and (4)  a violation of 18 U.S.C § 922(j) (possession of a stolen firearm) [Dkt. 46].

## II.    THE MOTION TO SUPPRESS

On July 9, 2018, Defendant filed the instant Motion to Suppress, seeking suppression of "all items and statements derived from the traffic stop that the Paris Police Department initiated on December 3, 2016" [Dkt. 39 at 1].   The Government filed a Response on July 12, 2018 [Dkt. 45]. On July 11, 2018, the Court set Defendant's Motion for hearing on July 16, 2018.   On July 12, 2018, Defendant moved to continue the suppression hearing [Dkt. 49]; the Court rescheduled the suppression hearing for August 10, 2018 [Dkt. 55].   On August 6, 2018, Defendant requested a second continuance of the suppression hearing [Dkt. 60], which the Court granted, rescheduling the hearing for August 28, 2018 [Dkts. 61; 62].   On August 21, 2018, Defendant's counsel withdrew his representation [Dkt. 68]; new counsel was thereafter appointed for Defendant.   New counsel requested to proceed on the Motion to Suppress, and the Court reset the suppression hearing for October 12, 2018.

Defendant's Motion argues that Paris Police Department's ("PPD") traffic stop and further detention of Defendant on December 3, 2016 violated both Defendant's Fourth and Fifth Amendment rights because the PPD officers lacked an objectively reasonable suspicion that illegal activity occurred or was about to occur before stopping Defendant's vehicle, and further, the PPD officers prolonged the traffic stop after any alleged reasonable suspicion dissipated in an effort to manufacture probable cause.[1]

The Court conducted an evidentiary hearing on October 12, 2018, which the Court reconvened on October 15, 2018.   Prior to opening testimony at hearing, Defendant invoked the Rule, at which the Government did not object.   At hearing, the Government put on the Patrol Lieutenant ("Lieutenant") and Officer ("Officer") with the PPD who conducted the stop, and

---

[1] The Parties agreed at hearing that Defendant has standing to contest the search and seizure of the vehicle, even though he does not own the vehicle.   As such, the Court does not discuss standing.

admitted five exhibits. Government's Exhibit One is the full video footage of the traffic stop involving Defendant from both Lieutenant's: (1) dash camera; and (2) body camera. Government's Exhibit Two is the condensed video footage of the traffic stop. Government's Exhibit Three is the audio from the 911 call. Government's Exhibit Four is Lieutenant's narrative from his police report related to the traffic stop. Government's Exhibit Five is an affidavit from Captain Huff of PPD authenticating the audio recording of the 911 call. Defendant called no witnesses and admitted no exhibits at Hearing. Following the hearing, both Defendant and the Government filed post-hearing briefing, received on October 22 and October 25 respectively, regarding the two prong *Terry*-analysis for traffic stops and a purported violation of the Rule [Dkts. 87; 90].

The underlying facts relevant to Defendant's Motion to Suppress are summarized as set forth below.

### III.    TRAFFIC STOP AND DETENTION

On December 3, 2016, a 911-operator received a phone call from a motorist (who provided his full name and phone number [Government's Exhibit No. 3 at 6:28]) that the driver of a newer, white, Nissan Maxima was driving erratically and was potentially intoxicated; the motorist continued to follow the vehicle while staying on the phone with the 911 dispatcher [Government's Exhibit No. 3 at 0:44]. The 911 caller also provided the license plate number of the vehicle [Government's Exhibit No. 3 at 2:05]. The 911 caller reported that the driver was "all over the road" and "cannot keep that thing between the lines" [Government's Exhibit No. 3 at 0:46, 0:51]. The 911 caller then described where the driver started to cross into another lane and almost hit another car [Government's Exhibit No. 3 at 3:51]. Officers were dispatched to the area. The 911 caller represented to the dispatcher that moments before Lieutenant arrived, the driver began to

drive slowly and seemed aware that the 911 caller was following him, and was "all the way on the left-hand side of the road" [Government's Exhibit No. 3 at 5:35, 6:09]. Throughout the 911 call, the caller provided updates of his location and continued to follow the vehicle, breaking his pursuit once he was passed by Lieutenant's squad car [Government's Exhibit No. 3 at 6:34].

Lieutenant testified that he heard from dispatch that there was a potential intoxicated driver in the area and was apprised of the vehicle's make, model, and color, and the vehicle's location; Lieutenant then navigated to the area to find the suspect vehicle [Dkt. 83 at 23, 39-40; Government's Exhibit No. 1, Moss 1 at 3:00]. When he spotted the vehicle, Lieutenant observed the vehicle driving "left of center" on an unmarked road before making a wide right turn onto another unmarked road [Dkt. 83 at 23, 40-41, Government's Exhibit No. 1, Moss 1 at 6:11]. Lieutenant testified that the vehicle was not weaving, impeding traffic, swerving, or speeding [Dkt. 83 at 59-61]. Lieutenant testified that he activated the lights on his squad car, but the vehicle did not stop [Dkt. 83 at 26, Government's Exhibit No. 1, Moss 1 at 6:15]. After Lieutenant activated his lights, Officer arrived on the scene and testified that he also observed the vehicle driving left of center and failing to stop for Lieutenant's lights [Dkt. 84 at 70-71]. Lieutenant then activated his squad car's siren, and again, the vehicle did not stop [Dkts. 83 at 27, 84 at 71, Government's Exhibit No. 1, Moss 1 at 6:39]. The vehicle finally parked in a parking spot located in an apartment complex. Defendant later revealed to Lieutenant that Defendant's friends lived at the apartment [Dkt. 83 at 30, 41]. Lieutenant parked his squad car behind the vehicle [Government's Exhibit No. 1, Moss 1 at 7:29]. Lieutenant testified that at this moment, all indications pointed to this being a "DWI" [Dkt. 83 at 41].

Lieutenant approached the vehicle's driver side door while Officer approached the passenger side, and asked Defendant, who was the driver, why he failed to stop after Lieutenant activated his squad car's lights and sirens, to which Defendant replied that he failed to see the lights or hear the sirens and had to turn his music down [Dkt. 83 at 25; Government's Exhibit No. 1, Moss 1 at 7:40]. Lieutenant then asked Defendant to exit the vehicle "because [he] couldn't see in the rest of the vehicle, see if anybody else in there" [Dkt. 83 at 26; Government's Exhibit No. 1, Moss 1 at 7:46]. Lieutenant asked Defendant for his driver's license [Government's Exhibit No. 1, Moss 1 at 8:07]. Lieutenant testified that once Defendant stepped out of the vehicle, Lieutenant smelled alcohol on Defendant and/or from within the vehicle and identified that Defendant was slurring his speech [Dkt. 83 at 26]. Defendant asked what he did wrong, to which Lieutenant responded that Defendant "was driving all over the road," "pretty bad," "middle of the road," "slow rolling" [Government's Exhibit No. 1, Moss 1 at 8:18, 8:45]. Lieutenant then asked Defendant numerous identifying questions about the information on his driver's license [Government's Exhibit No. 1, Moss 1 at 8:37], and inquired as to whether anyone else was in the vehicle [Government's Exhibit No. 1, Moss 1 at 8:58]. When Lieutenant asked Defendant whether he had been drinking, Defendant initially represented that he had not had anything to drink, and then when asked a second time, Defendant stated he had only had one beer [Dkt. 83 at 42, Government's Exhibit No. 1, Moss 1 at 9:02]. Lieutenant asked Defendant if he had smoked anything, to which Defendant replied that he had only smoked a cigar [Government's Exhibit No. 1, Moss 1 at 9:10]. Lieutenant asked Defendant if only one beer made him drive in such a manner [Government's Exhibit No. 1, Moss 1 at 9:28] and notified Defendant that a 911 caller had reported his erratic driving [Government's Exhibit No. 1, Moss 1 at 9:40]. Lieutenant continued

on to ask Defendant questions about the vehicle and whether he had any outstanding warrants [Government's Exhibit No. 1, Moss 1 at 9:57, 10:15].

While questioning Defendant, Lieutenant handed Defendant's driver's license to Officer and thereafter approached Defendant's vehicle after asking him about a knife on Defendant's person [Government's Exhibit No. 1, Moss 1 at 10:09].  Simultaneously, Officer returned to Lieutenant's squad car and ran a warrant and driver's license check on Defendant.  In looking in the vehicle's window with his flashlight, Lieutenant noticed a dog in the vehicle and also saw a baggie of marijuana in the floorboard [Dkt. 84 at 14-15, 29].[2]  Lieutenant testified that at this moment, he knew he was arresting Defendant for possession of a controlled substance [Dkt. 84 at 30].  Lieutenant initially testified that while Defendant was exiting the vehicle, he could observe a

---

[2] The Court notes that at hearing, Lieutenant confused his testimony numerous times, including regarding the time when he first discovered the bag of marijuana in Defendant's vehicle.  The Court does not believe that Lieutenant did so in an effort to deceive or mislead the Court; rather, the Court finds that due to the significant passage of time, it is obvious that Lieutenant lacks a clear recollection of some of the events involving the traffic stop at issue in this matter. Indeed, Lieutenant testified that that he initially believed that he saw the marijuana when Defendant first stepped out of the vehicle, but that upon watching the video during his direct examination, he realized that was incorrect and instead saw the marijuana when he approached the vehicle to perform a "pat down" and look inside for other individuals;  Lieutenant testified that he made such a mistake because "it has been two years" [Dkt. 83 at 76].  The Court has reviewed numerous times and relies significantly on the video footage depicting the real-time events of the traffic stop because the Parties agree the video evidence is the best depiction of the events at issue in this matter and as best put by Defendant's counsel, "the video is going to show what the video is going to show."  *See United States v. Montgomery*, SA-08-CR-387 OLG, 2012 WL 12882851, at *2 (W.D. Tex. Mar. 30, 2012), *report and recommendation adopted*, CR SA-08-CR-387-OG, 2012 WL 12882852 (W.D. Tex. Apr. 16, 2012) ("Rios' testimony at the evidentiary hearing does not undermine the critical evidence –which is the video recording of the interrogation itself").  After reviewing his report and re-watching the videos, Lieutenant testified that "[a]fter I gave [Officer] the driver's license to run his warrant check or DL check, even though I had already approached the car to see if there was somebody in there, I still like to do a pat down of the car completely. And when I do this pat down particularly, this is when I saw the bag of marijuana in the floorboard." [Dkt. 84 at 29].  The Court finds that this testimony is supported by the video evidence.  The video shows that after Lieutenant handed Officer the Defendant's driver's license, he approached Defendant's vehicle, shining his flashlight inside [Government's Exhibit No. 1, Moss 1 at 10:10].  At the same time, Officer entered the squad car to perform the various checks on Defendant's license.  After Lieutenant approached the vehicle, he inquired about the viciousness of the dog located inside of the vehicle [Government's Exhibit No. 1, Moss 1 at 10:45 ] and then told Defendant that arrangements must be made for the dog to be taken away from the vehicle because there is a "big ol' bag of weed right there on the floorboard" [Government's Exhibit No. 1, Moss 1 at  10:59, 11:15].  Lieutenant then directed Defendant to put his hands on the vehicle and subsequently conducts a pat down of Defendant's person, all the while keeping a hold of Defendant's jacket [Government's Exhibit No. 1, Moss 1 at 11:28].  Officer returned from conducting checks on Defendant's license while Lieutenant is in the process of patting Defendant's person down [Government's Exhibit No. 1, Moss 1 at 12:02].  The video evidence makes clear that Lieutenant saw the bag of marijuana on the floorboard when he approached the vehicle subsequent to Officer's departure with Defendant's license.

REPORT AND RECOMMENDATION – Page 6

baggie of marijuana in the floorboard [Dkt. 83 at 26]; however, after reviewing the video and his report, Lieutenant corrected his testimony and clarified that he did not observe the baggie of marijuana until later in the stop, as discussed *supra*.  Lieutenant asked Defendant and his friends (who resided in the apartment) about the dog in the vehicle, and specifically asked whether the dog was vicious [Government's Exhibit No. 1, Moss 1 at 10:23].  Lieutenant asked how Defendant proposed to control the dog; Lieutenant stated that there is a "big ol' bag of weed right there on the floorboard" and indicated that he needed to search the vehicle, but could not with the dog inside [Government's Exhibit No. 1, Moss 1 at 11:16].  Lieutenant directed Defendant to put his hands on the vehicle and performed a pat down of Defendant's person [Government's Exhibit No. 1, Moss 1 at 11:24].  Lieutenant testified that he was unable to retrieve the baggie because Defendant's dog was inside the vehicle.

While Lieutenant was patting down Defendant's person, Officer returned from the squad car [Government's Exhibit No. 1, Moss 1 at 12:06]. Officer testified that after he returned with Defendant's driver's license, he asked Lieutenant whether Lieutenant "had anything" and Lieutenant responded quietly "38," which Officer testified at hearing, meant "drugs or narcotics or something like that [was] in the car" [Dkt. 84 at 73; Government's Exhibit No. 1, Moss Body 1 at 13:32].  Lieutenant allowed Defendant the opportunity to make arrangements for the dog, instead of calling animal control.  Instead, of placing Defendant in handcuffs, Lieutenant allowed Defendant's hands to be free while he made several phone calls in an attempt to find someone to take his dog; however, Lieutenant kept a hand on Defendant's back [Dkt. 84 at 32-34, Government's Exhibit No. 1, Moss 1 at 12:10].  Lieutenant testified that at this time, from his perspective, Defendant was no longer free to leave [Dkt. 84 at 33].

Defendant contacted numerous people before he finally secured someone willing to pick up his dog. Lieutenant allowed time for Defendant's friend to arrive and take the dog. After Defendant indicated that a friend was coming to take the dog, Lieutenant expressly stated that Defendant was under arrest and Lieutenant took Defendant to the patrol car to wait [Dkt. 84 at 37, Government's Exhibit No. 1, Moss 1 at 20:38, 24:43]. Lieutenant also indicated that he was going to place Defendant in handcuffs [Government's Exhibit No. 1, Moss 1 at 24:52]. While they were waiting, Lieutenant allowed Defendant to enter into the residence and use the restroom [Government's Exhibit No. 1, Moss 1 at 28:37].

After significant time had passed and Defendant's friend had still failed to arrive, Lieutenant allowed Defendant to secure the dog outside of the residence. Defendant took the dog from the vehicle and secured the animal outside of the residence. Thereafter, Defendant returned to the vehicle and retrieved a dog bed—as Defendant was carrying the dog bed to the residence, Lieutenant instructed Defendant to drop the dog bed [Dkt. 84 at 38, 75-76]. Defendant dropped the dog bed onto the sidewalk; upon impact, it sounded as if something metallic hit the concrete sidewalk. Lieutenant retrieved a handgun from the sidewalk that was hidden in the dog bed [Dkt. 84 at 38]. Once the dog was secured, Officer conducted a search of the vehicle, which yielded a cold, half-empty beer can and a cloth bag containing two glass jars: one containing baggies of marijuana and one containing baggies of what appeared to be cocaine[3] [Dkt. 84 at 38-39, 53, 74-75].

---

[3] Field tests of this substance were positive for cocaine.

# ANALYSIS

## I. THE RULE

Prior to witness testimony at hearing, Defendant invoked the Rule, asking for the witnesses to be sequestered from the courtroom – the Court thereafter ordered the witnesses not then testifying out of the courtroom until it was their opportunity to testify. Relevant herein, Officer exited the courtroom and remained in a conference room located outside of the courtroom for the duration of Friday's proceedings. Upon the conclusion of Friday's proceedings, Lieutenant, the case agent, and the AUSA entered into the conference room where Officer was located. The AUSA admonished Lieutenant, directing him to reread his report and re-watch the various audio and video footage from the traffic stop at issue in this matter. On Monday, when the Court reconvened, Defendant objected that such conference constituted a violation of the Rule and moved to strike both the Lieutenant and Officer's testimony. The Court took Defendant's objection and motion under advisement.

"At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony." *Miles v. HSC-Hopson Services Co., Inc.*, 625 F. App'x 636, 639 (5th Cir. 2015) (quoting Fed. R. Evid. 615). "[The Fifth Circuit] reviews a district court's compliance with Rule 615 for abuse of discretion, and we will reverse only if [the appellant] can demonstrate prejudice." *Id.* (quoting *United States v. Green,* 324 F.3d 375, 380 (5th Cir. 2003)). "The core purpose of the rule is to 'aid in detecting testimony that is tailored to that of other witnesses and is less than candid.'" *United States v. Fusilier*, 61 F. App'x 917 (5th Cir. 2003) (quoting *United States v. Wylie,* 919 F.2d 969, 976 (5th Cir. 1990)). "The opposing party must demonstrate resulting prejudice to obtain a reversal." *Green*, 293 F.3d at 891 (quoting *United States v. Hickman,* 151 F.3d 446, 453 (5th Cir. 1998)); *United States v. Posada–Rios,* 158 F.3d

832, 871 (5th Cir. 1998) (review of the district court's decision to allow the testimony of witnesses despite a violation of Federal Rule of Evidence 615, the rule of sequestration, is for abuse of discretion); *Moore v. United States,* 598 F.2d 439, 442 (5th Cir. 1979) (review of the district court's conduct at trial, including the examination of witnesses, is for abuse of discretion)).  "In evaluating whether an abuse of discretion has occurred, the focus is upon whether the witness's out-of-court conversations concerned substantive aspects of the trial and whether the court allowed the defense fully to explore the conversation during cross-examination." *Posada-Rios*, 158 F.3d at 871–72 (citing *Wylie,* 919 F.2d at 976).

Defendant contends that:

In this case, the Government discussed testimony with witnesses [Lieutenant] and Officer [] in the conference room within feet of the courtroom. Specifically, on Friday, October 12, 2018, AUSA [], ATF Agent, [Lieutenant], and Officer [] were in the conference following Day 1 of the Motion to Suppress hearing after the RULE had been invoked.  Based on the testimony of [Lieutenant] and Officer [], AUSA [] and the ATF agent were counseling a/k/a coaching [Lieutenant] on how bad he testified during the hearing.  As they counseled [Lieutenant], [Officer] was present in the room for the conversation.  [Officer] testified that he was present when they shared with him what he needed to improve his testimony.

***

Transmitting information about testimony from one witness to another sequestered witness is a violation of Rule 615, the same as if the sequestered witness had entered the courtroom and observed the testimony firsthand. . . .Furthermore, in this case the Government and Governmental agents was of the RULE and actually cause the violation as the witnesses were sequestered in the conference room as they discussed [Lieutenant]'s testimony. Lastly, holding the government in contempt or allowing counsel for the defendant to cross examine the witness is not a sufficient remedy. The Government does not enjoy the Due Process rights of a criminal defendant. By deduction, there are no countervailing concerns to precluding witnesses who violated the court's sequestration order when that violation came into existence with the assistance or knowledge of the Government's attorney.

[Dkt. 87 at 4-5 (internal citations omitted)].  The Government responds that:

Coleman misstates the facts. On October 12, 2018, the Court convened the hearing on Coleman's motion to suppress. The hearing continued until October 15, 2018. During the first part of the hearing,. . . .[i]n response to several questions about the events of the traffic stop, [Lieutenant] indicated that he could not

remember. . . .[but] also confirmed that the entire incident was recorded by several different cameras. . . .Afterward, in [Officer]'s presence, prosecutor told [Lieutenant] that he needed to read his reports and watch the videos so that he could recall what happened. After the hearing resumed, [Defendant's] counsel established that the prosecutor instructed [Lieutenant] to review his reports and the videos, and moved to exclude [Lieutenant]'s testimony and [Officer]'s testimony. [Lieutenant] confirmed that when the prosecutor spoke with [Officer], he [Lieutenant] was not present. [Lieutenant] also confirmed that when he testified on October 12, he made mistakes. [Lieutenant] followed the prosecutor's instructions to review his report and the videos over the weekend. . . . [Officer] confirmed that [Lieutenant] and the prosecutor never discussed the facts of the case or [Lieutenant]'s testimony. . . . [Officer] did not "know what [Lieutenant] testified to." [Officer] said that. . . [w]hile both witnesses were present, the prosecutor — who was obviously upset with [Lieutenant] — told [Lieutenant] that he needed to improve the manner in which he testified. [Lieutenant] and the prosecutor did not discuss the details of [Lieutenant]'s testimony.

***

Importantly, Coleman does not argue that the prosecutor reviewed the contents of any of [Lieutenant]'s testimony with [Lieutenant]  while [Officer] [was] present. Likewise, Coleman does not argue that the prosecutor's instructions to [Lieutenant] influenced [Officer]'s testimony. Nothing in the record indicates that any of the witnesses violated the Rule. The only thing [Officer]  knew is that [Lieutenant] could do a better job recounting the events in question. This knowledge could not have caused [Officer] to conform his testimony to [Lieutenant]'s testimony. The Rule prohibits the prosecutor from discussing the content of [Lieutenant]'s testimony in [Officer]'s presence. It does not prohibit her from admonishing [Lieutenant] that the manner in which he testified was insufficient.

[Dkt. 90 at 7-11].

In the instant case, the Court allowed Defendant's counsel to cross-examine both Lieutenant and Officer regarding the alleged violation of the Rule and the extent of the conversation between Lieutenant and the AUSA.  Officer testified that he was in the room when the AUSA expressed that she was upset with Lieutenant concerning his testimony and directed Lieutenant to study his reports and the video and audio footage of the traffic stop [Dkt. 84 at 88-89].  Officer further testified that they did not discuss the contents and/or details of Lieutenant's testimony [Dkt. 84 at 89-91].  Specifically, Officer testified that he only observed that the AUSA

was "upset with the Lieutenant. . . [about] [w]hat happened in [the courtroom], which [he] didn't know what happened" [Dkt. 84 at 88].

Upon cross-examination, Officer testified the conversation between Lieutenant and the AUSA did not concern the substance of Lieutenant's testimony.  In his post-hearing briefing, Defendant failed to indicate which portions of Officer's testimony seemed affected or altered due to the AUSA's comments to Lieutenant or indicate why cross-examination of both officers is an insufficient remedy to any potential violation of the Rule.  Because Defendant failed to point out any particular portions of testimony that appeared tailored to that of other witnesses and/or less than candid, "he has not [] demonstrate[d] that such testimony prejudiced his case in any way. . . .such 'a bald allegation that prejudice ensued is not enough.'" *United States v. Martinez-Rangel*, CR 5-10-2337, 2011 WL 13182892, at *3 (S.D. Tex. Apr. 12, 2011), *aff'd*, 458 F. App'x 373 (5th Cir. 2012) (quoting *United States v. Causey*, 609 F.2d 777, 778 (5th Cir. 1980)). Furthermore, Defendant was allowed an opportunity to fully cross-examine both Officer and Lieutenant regarding the contents of the conversation that took place after the hearing adjourned on Friday evening.

On the present record, it does not appear that Officer was directed as to what he should testify to or was influenced to testify any less candidly or truthfully because he was present when the AUSA admonished the Lieutenant.  The Court declines to strike either the Officer or Lieutenant's testimony.[4]  *See United States v. Posada-Rios*, 158 F.3d 832, 872 (5th Cir. 1998) ("Because the defendants were allowed a full opportunity to cross-examine Hall, and because the testimony that was elicited from Hall did not indicate that his testimony was influenced by his

---

[4] The Court does not find that the actions which led to Defendant's objection in the first place constitute prudent and/or best practice.  And the Court again references its heavy reliance on the video evidence admitted at hearing, and to which there were no objections at hearing, in making the instant recommendation.

conversations with Cortes, the district court did not err in refusing to strike the testimony of Hall and Cortes or to allow further questioning of Hall and Cortes outside of the presence of the jury."); *Hernandez v. United States*, W-09-CR-216(4), 2014 WL 12725646, at *4 (W.D. Tex. Dec. 30, 2014) ("Here, Petitioner has not offered any evidence that the four witnesses at issue discussed their testimony or even had the opportunity to speak about it while they were housed and transported together. Additionally, Petitioner has not brought forth any probative evidence showing he was prejudiced as a result of one witness'[s] testimony influencing another witness' testimony. Finally, Petitioner had the opportunity to cross-examine each witness during trial with respect to their credibility. Petitioner's first due process claim is without merit.") (internal citations omitted); *Fusilier*, 61 F. App'x at 917 ("Fusilier has failed to identify any portion of Salazar's testimony that was either 'tailored or less than candid.' Furthermore, defense counsel was afforded ample opportunity to examine the various witnesses regarding the asserted violation of FRE 615. We discern no abuse of discretion by the trial court in not excluding Salazar's testimony."); *United States v. Gilbert*, 199 F.3d 440 (5th Cir. 1999) ("The district court performed a lengthy evidentiary hearing on this matter, allowing Burton and Gilbert's trial attorneys ample opportunity to explore the conversation fully. Further, Burton was present during the conversation in question and was unable to provide any testimony regarding its substance from which the district court could find an effect on the testimony of the witnesses. Moreover, Gerard testified during the evidentiary hearing that he and Scott did not talk about the specifics of each other's testimony, but only in general terms. Thus, the admission of this testimony was not an abuse of discretion.").[5]

---

[5] Furthermore, in evaluating the credibility of the Government's witnesses, the Court was fully aware that Officer was apprised of Lieutenant's performance in testifying in the prior hearing, and "was free to believe or disbelieve their testimony. . . after considering all of the evidence in the record." *See United States v. Kirschenman*, 262 F. App'x 819, 821–22 (9th Cir. 2008) (the Ninth Circuit found that there was no error in court declining to strike the testimony of witnesses who had testified in the second suppression hearing after they had "reviewed either the transcript from the first [suppression] hearing, or the magistrate judge's report, or both.").

## II.    THE FOURTH AMENDMENT FRAMEWORK AND THE SUPPRESSION REMEDY

Defendant summarizes his argument as follows:

> [Defendant] contests that there was reasonable suspicion to initiate the traffic stop. The officer did not observe a traffic violation before initiating the stop, and as such, could not corroborate the information of the 911 caller. Once he was detained, officers did not act quickly to dispel any purported reasonable suspicion that had given rise to the stop. Finally, any subsequent statements were obtained from the fact that [Defendant] was placed in custody as a result of this traffic stop. The PPD would not have come into possession of [Defendant], or his statements, absent the initial traffic stop which should have terminated at the moment that the officer was close enough to determine that the automobile was not committing any traffic violations; and certainly, by the time officers had the opportunity to establish that [Defendant] was not intoxicated.

[Dkt. 39 at 6].

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The exclusionary rule, which permits criminal defendants to seek exclusion (suppression) of evidence obtained through "illegal search and seizure[,]" provides one vehicle through which citizens may "effectuate [this] Fourth Amendment right." *United States v. Calandra*, 414 U.S. 338, 347 (1974) (noting that this rule "applies as well to the fruits of the illegally seized evidence"). The U.S. Supreme Court has characterized exclusion through suppression for decades as an "extreme sanction" that courts should apply only sparingly. *United States v. Leon*, 468 U.S. 897, 926 (1984); *see also Herring v. United States*, 555 U.S. 135, 141 (2009) (warning that application of the exclusionary rule exacts "substantial social costs") (citations and internal quotations omitted); *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) ("Suppression of evidence, however, has always been our last resort, not our first impulse.").

The Fifth Circuit "analyze[s] the constitutionality of a traffic stop using the two-step inquiry set forth in *Terry v. Ohio,* 392 U.S. 1 (1968). First, we determine whether the stop was justified at its inception. If the initial stop was justified, we determine 'whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place.'" *United States v. Andres*, 703 F.3d 828, 832 (5th Cir. 2013) (quoting *United States v. Macias,* 658 F.3d 509, 517 (5th Cir. 2011)). "The officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." However, the constitutional reasonableness of the stop does not depend upon the actual motivations of the officer involved. *Id.* (citing *Whren v. United States,* 517 U.S. 806, 813 (1996)). "An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses." *Id.* (citing *Whren,* 517 U.S. at 812-13). "The government bears the burden of establishing by a preponderance of the evidence the two elements under *Terry.*" *United States v. Coleman*, 1:11-CR-142(5), 2012 WL 3112065, at *2 (E.D. Tex. July 10, 2012), *report and recommendation adopted*, 1:11-CR-142(5), 2012 WL 3115058 (E.D. Tex. July 31, 2012) (citing *United States v. McMahan,* 2007 WL 2470999, *4 (N.D. Tex. August 30, 2007) (citing *United States v. Sanchez–Pena,* 336 F.3d 431, 437 (5th Cir. 2003)); *United States v. Waldrop,* 404 F.3d 365, 368 (5th Cir. 2005))).

## III.   VALIDITY OF THE TRAFFIC STOP

Regarding the first prong of the Terry analysis for traffic stops, the Government contends that:

> The decision to stop a vehicle is reasonable where the police have probable cause to believe a traffic violation has occurred. [*Whren*, 517 U.S. at 810]. Section 49.04 of the Texas Penal Code states that a person commits an offense if the person is intoxicated while operating a motor vehicle in a public place. . . .A concerned

> citizen placed a 911 call alerting police that a driver of a Nissan Maxima was driving erratically. When [Lieutenant] observed the vehicle, he suspected the driver was driving under the influence because Coleman was driving down the middle of the road and failed to stop after lights and sirens were activated. [Lieutenant]'s decision to stop the vehicle was justified at its inception.

[Dkt. 45 at 5]. Defendant argues that Lieutenant was dispatched to investigate reports that a Maxima was weaving in and out of its lane, and upon finding the Maxima, Lieutenant observed a traffic violation – the Maxima was driving left of the center lane; therefore, the "relevant statute for the traffic stop" is Texas Penal Code § 545.060, Driving on Roadway Laned for Traffic. However, "at the time officers came into contact with [Defendant], he was not on a marked road," and thus, Lieutenant's initial stop of the vehicle was not supported by reasonable suspicion because Lieutenant "did not observe a traffic violation before initiating the stop, and as such, could not corroborate the information of the 911 caller" [Dkt. 39 at 6].

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *Andres*, 703 F.3d at 832–33 (quoting *United States v. Lopez–Moreno*, 420 F.3d 420, 430 (5th Cir. 2005)). A reasonable suspicion determination is based on the totality of the circumstances, and there is no requirement that a particular statute be violated in order to give rise to reasonable suspicion. *See United States v. Sokolow*, 490 U.S. 1, 9 (1989).

Lieutenant relied on the information provided from dispatch regarding the 911 caller's information related to Defendant's alleged erratic driving. Lieutenant testified that he was informed by dispatch that a 911 caller had reported a suspected drunk driver, and based on the description of the location, vehicle, and the erratic driving, in addition to Lieutenant's own observation of the vehicle traveling "left of center," making a wide turn, and failing to stop for

both the squad car's lights and sirens, Lieutenant initiated a traffic stop because "[a]ll indications [were]. . . DWI" [Dkt. 83 at 39-41].

"Whether a 911 call provides reasonable suspicion to justify a stop is determined on a case-by-case basis." *United States v. Gomez*, 623 F.3d 265, 269 (5th Cir. 2010) (citing *United States v. Vickers*, 540 F.3d 356, 361 (5th Cir.), *cert. denied,* 129 S.Ct. 771 (2008)). "The factors that must be considered in deciding whether a tip provides a sufficient basis for a traffic stop include: (1) the credibility and reliability of the informant; (2) the specificity of the information contained in the tip or report; (3) the extent to which the information in the tip or report can be verified by officers in the field; and (4) whether the tip or report concerns active or recent activity or has instead gone stale." *Id.* (citing *United States v. Martinez,* 486 F.3d 855, 861 (5th Cir. 2007)). "If a tip is provided by an anonymous informant, such that the informant's credibility and reliability cannot be determined, the Government must establish reasonable suspicion based on the remaining factors." *Id.* (citing *Martinez,* 486 F.3d at 862).

In the instant case, the 911 caller, identified himself, giving his full name and phone number to the dispatcher, thereby meeting *Martinez*'s first factor.  *See id.*, ("When asked his name, Mike readily offered it to the 911 operator. Moreover, the officers conducting the stop had no reason to believe they were acting on an anonymous tip. . . . Rather, they had been given a name, phone number, and address of the concerned citizen who had called in the complaint.") (citing *United States v. Burbridge,* 252 F.3d 775, 778–79 (5th Cir. 2001)); *Tyler v. State*, 491 S.W.3d 1, 4–5 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("Poovey's use of the 911 system additionally provides some indicia of reliability"); *see also United States v. Johnson*, 592 F.3d 442, 449–50 (3rd Cir. 2010) ("Though she did not speak face-to-face with a police officer, she freely and repeatedly provided the police dispatcher with her name and telephone number, and the location of her home.

These data points enhanced Anderson's credibility and the reliability of her report by allowing the police to hold her responsible if her tip ultimately proved false.") (citing *Florida v. J.L.,* 529 U.S. 266, 270 (2000); *United States v. Nelson,* 284 F.3d 472, 482 (3d Cir. 2002); *United States v. Torres*, 534 F.3d 207, 212 (3rd Cir. 2008) (an informant's reliability was enhanced because he identified himself by telling a police dispatcher "that he was driving a green taxicab from a specified company.")).[6]  In satisfaction of the second *Martinez* factor, the 911 caller provided "an extraordinary amount of detail in his call."   Specifically, the 911 caller provided the ongoing location of the alleged intoxicated driving, the make, model, color, and license plate number of the vehicle [Government's Exhibit No. 3 at 0:38-2:16].  *See Gomez*, 623 F.3d at 269; *see also United States v. Booker*, 4:16-CR-00113, 2016 WL 7471322, at *4 (N.D. Miss. Dec. 28, 2016) ("The high degree of specificity in the anonymous call satisfies the specificity factor of the inquiry."); *Nelson,* 284 F.3d at 483 (detailed information regarding, model, color, and other distinctive characteristics of vehicle supported reliability of information provided by anonymous informant). Furthermore, the details of the 911 call demonstrated that the caller was reporting activity that the caller believed constituted ongoing criminal activity; the 911 caller mentions the car being "all over the road" and driving on the left side of the road multiple times.  *See Tyler*, 491 S.W.3d at 4–5 ("Poovey provided a detailed eyewitness description of suspicious activity likely related to a crime, i.e., an assault or tight in progress in a parking lot between a man and a woman with the man at one point appearing to choke the woman. Poovey additionally described the specific vehicle that the two combatants entered and provided the address of the parking lot."); *Booker*, 2016 WL 7471322, at *4 ("Finally, the anonymous tip concerned ongoing conduct—the carrying of a firearm.").

---

[6] Even assuming the 911 caller was an "anonymous tipster," Lieutenant still had reasonable suspicion in light of the remaining factors set forth in *Martinez,* as discussed *infra*.

Only a few minutes after the inception of the 911 call, Lieutenant was able to verify at least certain of the 911 caller's assertions including specifically all of the vehicle information and the location, which has been found by other courts sufficient to meet *Martinez* factor three.[7]  Only a few minutes after the inception of the 911 call, Lieutenant was able to verify at least certain of the 911 caller's assertions, including specifically all of the vehicle information and the location, which has been found by other courts sufficient to meet *Martinez* factor three.[8]  *See Gomez*, 623 F.3d at 269; *see Tyler*, 491 S.W.3d at 4–5 ("Police were able to confirm part of Poovey's report when they drove to the parking lot and observed a vehicle matching his description exiting the lot."); *Booker*, 2016 WL 7471322, at *4 ("Furthermore, the officers were able to verify the bulk of the information, including Booker's identity and location as well as the presence of Booker's car."). Moreover, it is undisputed that police spotted the car and conducted the stop very shortly after receiving the dispatcher's details from the 911 call, in satisfaction of *Martinez*'s fourth factor.  *See Gomez*, 623 F.3d at 269.

In the instant case, the 911 caller's tip contained adequate indicia of reliability to support reasonable suspicion that Defendant was a possible intoxicated driver.  In addition to the *Martinez* factors being met, the tip (1) was based on eyewitness knowledge, which "lends significant support to the tip's reliability;" (2) was made simultaneously, which is "especially trustworthy because substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation;" and (3) was made to 911, which "has some features that allow for

---

[7] In *United States v. Andres*, in considering allegations made in a 911 call, the court discounted the defendant's argument that the video evidence "reveal[ed] no lighting problems or swerving," and noted "this does not establish that the swerving and lighting problems were not present prior to the stop, when Andres was traveling at highway speed." 703 F.3d 828, 833 (5th Cir. 2013).

[8] In *United States v. Andres*, in considering allegations made in a 911 call, the court discounted the defendant's argument that the video evidence "reveal[ed] no lighting problems or swerving," and noted "this does not establish that the swerving and lighting problems were not present prior to the stop, when Andres was traveling at highway speed." 703 F.3d 828, 833 (5th Cir. 2013).

identifying and tracing callers, and thus provide some safeguards against making false reports with immunity." *See  Navarette v. California,* 134 S.Ct. 1683,1689–90 (2014) (the Supreme Court found reasonable suspicion where a 911 caller reported that a vehicle ran her car off the road, and provided the location and description of the vehicle and license plate number.  This information was relayed to officers, who about eighteen minutes later, spotted and pulled over a vehicle some nineteen miles south of the location reported in the tip).

Moreover, as to Defendant's argument that Lieutenant was unable to form reasonable suspicion to conduct a traffic stop because no violation of Texas Penal Code § 545.060 (Driving on Roadway Laned for Traffic) occurred as the road Defendant was on at the occasion police encountered him was unmarked and/or not laned,  another court presented with a similar argument in a state habeas petition found that even if the officer's articulation that he pulled over the defendant for failure to maintain a single lane of traffic (pursuant to § 545.060) was unreasonable, the traffic stop was valid based on the officer's reasonable suspicion that the defendant was driving while intoxicated.  *Madison v. Cockrell*, CIV.A. 4:03-CV-008-Y, 2003 WL 21267070, at *5 (N.D. Tex. May 29, 2003), *report and recommendation adopted,* CIV.A. 4:03-CV-008-Y, 2003 WL 21500542 (N.D. Tex. June 19, 2003) ("Even if Officer Hatfeld's belief that Madison had violated § 545.060 w[as] unreasonable, the stop was valid based on his reasonable suspicion that Madison was driving while intoxicated.") (citing *United States v. Brignoni–Ponce,* 422 U.S. 873, 880 (1975)).  The *Madison* court echoed *Sokolow* that "a reasonable suspicion determination is based on the totality of the circumstances, and there is no requirement that a particular statute be violated in order to give rise to a reasonable suspicion.  *Id*. at *5.  In *Madison* where "[t]he officer was aware of the informant's tip that Madison was possibly driving while intoxicated" coupled with his own observation of the car, "this was sufficient to establish reasonable suspicion, based on

articulable facts, to believe that Madison was driving the motor vehicle while intoxicated." *Id.* (citing *United States v. Ramirez,* 213 F.Supp.2d 722, 725 (S.D. Tex. 2002), *aff'd United States v. Ramirez,* 66 F. App'x 523 (5th Cir. 2003)); *see also Johnsen v. Texas,* No. 04-16-00446-CR, 2017 WL 504696, at *3 (Tex. App.—San Antonio Feb. 8, 2017) (Texas appellate courts considering the same issue in light of the same statute alleged herein have found that "[t]here is no requirement that a traffic law be violated before an officer has reasonable suspicion to justify a stop of a vehicle. '[A]n officer may be justified in stopping a vehicle based upon a reasonable suspicion of driving while intoxicated, which is a penal offense.'") (quoting *Texas v. Alderete,* 314 S.W.3d 469, 473 (Tex. App.—El Paso 2010, pet. ref'd).

In the instant case, Lieutenant testified that he was aware of the 911 caller's information regarding the potentially intoxicated driver in the Nissan Maxima, and upon arriving on the scene, he observed that the Maxima was driving on the wrong side of the road (left of center), made a wide turn, and then failed to stop after Lieutenant activated his squad car's lights and sirens [Dkt. 83 at 39-41]. Furthermore, the dispatcher's relay of information can be heard in the dash camera footage from inside Lieutenant's squad car [Government's Exhibit No. 1, Moss 1 at 1:00]. Accordingly, even if Lieutenant's suspicion was unreasonable as to the referenced statute, the traffic stop was nonetheless valid based on Lieutenant's reasonable suspicion, following the 911 call, that Defendant was driving while intoxicated. *See Madison,* 2003 WL 21267070, at *5; *see also United States v. Sanchez-Pena,* 336 F.3d 431, 437–38 (5th Cir. 2003) ("we conclude that, based on his experience, Officer Bates had a reasonable basis to suspect that Sanchez was driving under the influence in violation of Texas law, because Sanchez was both veering from his lane and driving substantially below the posted speed limit"). The first prong of the *Terry* analysis is met.

IV.    **DURATION AND SCOPE OF THE STOP**

The Government next asserts that the second prong of *Terry* is met because:

> During the traffic stop, [Lieutenant] developed articulable suspicion that criminal activity was afoot. At the initial encounter, Coleman told [Lieutenant] he has not seen nor heard the patrol unit's lights and sirens. Once Coleman exited the vehicle, [Lieutenant] could smell alcohol on Coleman's breath. After looking inside the vehicle, [Lieutenant] observed a bag of marijuana on the floor of the driver's side of the vehicle. [Lieutenant] was unable to retrieve the bag of marijuana because Coleman advised that the dog would bite. Less than five minutes into the stop, [Lieutenant] had developed reasonable suspicion and observed what he believed to be marijuana in a plastic baggie. . . .Coleman was arrested. Due to [Lieutenant]'s kindness, numerous efforts were made to secure the dog. Coleman took advantage of [Lieutenant]'s kindness and used that opportunity to attempt to hide a firearm that was located inside the dog's bed. Any "prolonged detention" was a direct result of Coleman's procrastination and subsequent behavior. . . . From the time the vehicle was stopped until [Lieutenant] found the marijuana was less than five minutes. Five minutes is not an unreasonable amount of time to confirm or dispel [Lieutenant]'s suspicions. The stop and detention lasted no longer than necessary. Looking at the totality of the circumstances, [Lieutenant] had sufficient reason to believe that criminal activity was occurring and to detain Coleman during the investigatory stop. The length of detention and the scope of investigation were reasonable in light of [Lieutenant]'s observations.

[Dkt. 45 at 7-8 (internal citations omitted)].  Defendant argues that the second prong is not met here because "[a]t the time of the stop, [Lieutenant] requested the defendant to step out of his vehicle. . . . [Lieutenant] said he could smell the odor of alcohol. . . . [Lieutenant] started and concluded his DWI Investigation with the following exchange: [Lieutenant] – Have you had anything to drink? Defendant – I had one beer. [Lieutenant] never inquired when or where he had his one beer" [Dkt. 87 at 2-3].

"The second prong of the *Terry* test is satisfied if the officer's actions after making a legitimate traffic stop were reasonably related to either the circumstances that justified the stop or to dispelling reasonable suspicion developed during the stop." *United States v. Swan*, 259 F. App'x 656, 659 (5th Cir. 2007).  A traffic stop "must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable

facts, emerges." *United States v. Brigham,* 382 F.3d 500, 507 (5th Cir. 2004) (en banc).  "If the officer develops reasonable suspicion of additional criminal activity during his investigation of the circumstances that originally caused the stop, he may further detain [the] occupants [of the vehicle] for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *United States v. Pack,* 612 F.3d 341, 350 (5th Cir. 2010).  "A *Terry* '"detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop,"' but if further reasonable suspicion emerges during the stop and is supported by articulable facts, detention may continue until the new reasonable suspicion has been dispelled or confirmed." *Swan*, 259 F. App'x at 659 (quoting *United States v. Lopez-Moreno*, 420 F.3d 420, 430–31 (5th Cir. 2005) (quoting *Brigham,* 382 F.3d at 507)).

"During this brief period of detention, the officer may examine the driver's license and vehicle registration, run a computer check on the driver and the vehicle, and question the driver about a wide range of matters, including those unrelated to the purpose of the traffic stop." *Id.* (citing *Lopez-Moreno*, 420 F.3d at 430–31); *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) ("Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to [the traffic] stop. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.") (internal quotation marks and citations omitted).  "An officer may also ask about the purpose and itinerary of a driver's trip during the traffic stop." *Brigham*, 382 F.3d at 507–08 (citing *United States v. Gonzalez,* 328 F.3d 755, 758–59 (5th Cir. 2003)).  "Such questions may efficiently determine whether a traffic violation has taken place, and if so, whether a citation

or warning should be issued or an arrest made. All these inquiries are within the scope of investigation attendant to the traffic stop." *Id*.

"Moreover, [the Fifth Circuit] has eschewed any particularized limitations on the permissible investigative tools that may be utilized in connection with a *Terry* stop, holding that the relevant inquiry is '"whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly."'" *Swan*, 259 F. App'x at 659 (quoting *Brigham,* 382 F.3d at 511 (quoting *United States v. Sharpe,* 470 U.S. 675, 686, (1985))); *United States v. Andres*, 703 F.3d 828, 833–34 (5th Cir. 2013) ("the question is only whether Andres was detained for longer than necessary to deal with the initial traffic violations, and if so, whether additional reasonable suspicion of wrongdoing developed during the time that Brody was legitimately addressing the traffic violations.").

In the instant case, Defendant parked outside of the apartment complex after being followed by Lieutenant in Lieutenant's squad car while the lights and sirens were activated.  After parking, Lieutenant exited his vehicle and approached the vehicle, and asked Defendant why he failed to stop his vehicle earlier.  Lieutenant ordered Defendant out of the vehicle; Defendant complied.  Lieutenant asked for Defendant's driver's license; Defendant complied.  Defendant then asked what he did wrong, to which Lieutenant responded that Defendant "was driving all over the road," "pretty bad," "middle of the road," "slow rolling."  Lieutenant then asked Defendant various questions about the information on his driver's license and whether anyone else was in the vehicle.  Lieutenant then asked Defendant whether he had been drinking; Defendant initially denied having had anything to drink, and then when asked a second time, Defendant stated he had had a beer.  Lieutenant also asked Defendant if he had smoked anything, to which Defendant replied that he had only smoked a cigar.  Lieutenant then asked Defendant if only one beer made

him drive in such a manner and informed Defendant that a 911 caller had reported his erratic driving. Lieutenant proceeded to ask various questions about the vehicle and whether he had any outstanding warrants, and during this exchange the video makes clear he handed Defendant's driver's license to Officer. After handing over the license, and while a check was still being run on the license, Lieutenant approached Defendant's vehicle for a "pat down" and looked inside with his flashlight. Again, contemporaneous with Lieutenant's approach to the vehicle, Officer returned to Lieutenant's squad car to run a warrant and driver's license check on Defendant. In looking in the vehicle's window with his flashlight, Lieutenant saw a baggie of marijuana in the floorboard. Lieutenant then asked Defendant and his friends (who resided at the apartment complex) about the dog in the vehicle, specifically inquiring whether the dog was vicious. When he was informed by both Defendant and the residents that the dog would bite, Lieutenant asked how Defendant proposed to control the dog because there was a "big ol' bag of weed right there in the floorboard." These statements regarding the time of Lieutenant's discovery of the marijuana are clear on the full video clips proffered to the Court in Government's Exhibit 1. Lieutenant immediately after these statements directed Defendant to put his hands on the vehicle and performed a pat down of Defendant's person. While Lieutenant was patting down Defendant, Officer returned from the squad car having completed the license check.

Defendant contends that this progression of events demonstrates that the stop was illegally prolonged "[b]ecause the purpose of the stop was for DWI and [Lieutenant] didn't fulfill that purpose. He stopped. He didn't continue a[ DWI] investigation" [Dkt. 84 at 101]. Even though Lieutenant did not continue with any investigation into whether or not Defendant was driving

while intoxicated prior to finding the baggie of marijuana in plain view[9] in the Defendant's vehicle, the Court finds that he and Officer still acted within the scope of a valid traffic stop by inquiring as to the vehicle and any potential outstanding warrants related to Defendant and running routine checks on Defendant's license.  It was *while* Officer was running such checks on Defendant's license that Lieutenant discovered the bag of marijuana in plain view in the floorboard of Defendant's vehicle.

The Fifth Circuit has held that such actions taken prior to the completion of routine license checks do not constitute prolonged detention under the second prong in *Terry*.  *See United States v. Shabazz*, 993 F.2d 431, 437 (5th Cir. 1993) (indicating that questioning taken while officers wait for results of a computer check does not exceed the scope of the initial detention of the traffic stop); *United States v. Spence*, 667 F. App'x 446, 447 (5th Cir. 2016) ("While waiting for the results of computer checks, the police can question the subjects of a traffic stop even on subjects unrelated to the purpose of the stop.") (citing *Shabazz*, 993 F.2d at 437); *United States v. Andres*, 703 F.3d 828, 833–34 (5th Cir. 2013) ("Brody's question asking where Andres was driving from occurred before Brody had finished dealing with the traffic offenses and did not extend the scope or duration of the stop."); *United States v. Pack*, 612 F.3d 341, 348–49 (5th Cir. 2010), *opinion modified on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010) ("Pack cannot validly allege that the detention that followed the stop immediately violated his Fourth Amendment rights. Any such argument is plainly untenable under our case law. *See, e.g.,* [*Brigham,* 382 F.3d at 507–08] (describing the types of inquiries and routine checks a police officer may perform

---

[9] Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson,* 508 U.S. 366, 375 (1993).  Defendant does not contest that the marijuana was within plain view, but rather argues that Lieutenant had exceeded the scope of the detention at this point in his interaction with Defendant, thereby running afoul of the second *Terry* prong.

automatically upon making a lawful traffic stop). This leaves Pack's claim that his detention became illegal after Worley completed the driver's license and criminal history checks."). In *Shabazz*, similar to the instant case, the officer asked Defendant to exit the vehicle and produce his driver's license, and then called in for a computer check of the license – the Fifth Circuit held that "[t]he questioning that took place occurred while the officers were waiting for the results of the computer check," and "[t]herefore. . . . did nothing to extend the duration of the initial, valid seizure." 993 F.2d at 437.

In the instant case, although Lieutenant had stopped the specific line of questioning related to whether Defendant was driving while intoxicated, he approached the vehicle to perform a "pat down" and discovered the marijuana in plain view while Officer was performing a check on Defendant's license. Upon discovering the marijuana, Lieutenant sought to remove the dog from the vehicle (so as to allow the vehicle to be searched) and proceeded to pat down Defendant, keeping his hand on Defendant's back and restricting his mobility.[10] The Court does not find that the detention was prolonged or fell outside of the scope under *Terry*.

In sum, given the 911 call and Lieutenant's observations, the traffic stop based on a suspected intoxicated driver was supported by reasonable suspicion. Further, the subsequent detention of Defendant was not prolonged because both PPD officers directed their actions towards investigating their reasonable suspicion that Defendant was driving while intoxicated, checking Defendant's driver's license, determining whether there are outstanding warrants against the Defendant, and inspecting the vehicle's registration and proof of insurance. During the course of their investigation, Lieutenant discovered a bag of marijuana in plain view, thereby giving the PPD

---

[10] The Government contends that at this point, Defendant was under arrest and the traffic stop ended. Defendant does not argue that he was not under arrest at this point in the traffic stop; rather, Defendant's argument as it relates to his Motion to Suppress is that the PPD officers prolonged the detention under *Terry* by not releasing Defendant or continuing their investigation into whether he was driving while intoxicated.

officers probable cause to arrest Defendant for possession of a controlled substance and search Defendant's person and vehicle incident to such arrest. *See, e.g.*, *United States v. White*, 3:08-00088, 2008 WL 4372919, at *5–6 (M.D. Tenn. Sept. 19, 2008) (holding that an officer had probable cause to arrest defendant for possession of a controlled substance after observing a "corner bag" on the floorboard and marijuana blunts between the door and driver's seat, and, incident to that arrest, was permitted to search the defendant's person and car). Accordingly, Defendant's Motion to Suppress should be denied.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, the Court recommends Defendant Jerry Lynn Coleman's Amended Motion to Suppress Evidence [Dkt. 39] be **DENIED**.

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 16th day of November, 2018.**

_____
Christine A. Nowak
UNITED STATES MAGISTRATE JUDGE